**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ANGELA M. STAGE,**

     **Plaintiff,**

                            **Civil Action 2:14-cv-1427**
   **v.**                            **Judge Michael H. Watson**
                                  **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Angela M. Stage, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 20), and the administrative record (ECF No. 9). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.   BACKGROUND

Plaintiff filed her applications for benefits in August 2011, alleging that she has been disabled since July 6, 2011 due to a depression, anxiety, obesity, sleep apnea, arthritis in the knees, and lateral epicondylitis in her right elbow. (R. at 298-304, 305-10, 326.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing

before an administrative law judge.  Administrative Law Judge Mary F. Withum ("ALJ") held a hearing on February 26, 2013, at which Plaintiff, represented by counsel, appeared and testified. (R. at 87–118.)  Brian Womer, a vocational expert, also appeared and testified at the hearing.  On March 25, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 131–47.)  On July 11, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–7.)  Plaintiff then timely commenced the instant action.

## II.  HEARING TESTIMONY

### A.  Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives in a house owned by her mother.  (R. at 96.)  Plaintiff testified that she drives on a limited basis, but if she needs to go a far distance, she has her daughter drive.  (*Id.*)  When asked what the most serious condition that limits her ability to work, Plaintiff responded her that it was her depression.  (R. at 97-98.)  Plaintiff testified that she tried counseling but quit because it made her feel worse.  (R. at 98.)  At the time of the hearing, she was taking medications for depression, but testified she did not notice that they helped.  (R. at 98-99.)  Her medication has been prescribed by her primary care physician, Dr. Dodd.  (R. at 99.)  She was also receiving medication from Dr. Dodd from her other conditions, such as pain medication, high blood pressure and high cholesterol.  (*Id.*)  When asked about seeing Dr. Sardo for pain management, she noted she was told that the doctors would not perform surgery until she loses weight.  (*Id.*)  She testified that she had gained almost 100 pounds in the two years prior to the hearing.  (*Id.*)  She has not spoken to Dr. Dodd about

seeking further mental health treatment because she does not like talking about her condition and is afraid people will judge and criticize her.  (R. at 100.)

During a typical day, Plaintiff attempted to perform some household chores, "but it doesn't always work out for me."  (R. at 101.)  She does laundry, but bending to use the dryer hurts her back.  (R. at 102.)  She cleans dishes, but she must alternate between sitting and standing to complete them.  (*Id.*)  She does not vacuum due to back pain.  (*Id.*)  She must lay down to relieve pain after standing for long.  (*Id.*)  Her daughter does the cooking.  (*Id.*)

Her medications make her very tired and drowsy, but Plaintiff indicated that if she does not take them she cannot physically function.  (*Id.*)  Plaintiff rated her pain severity on a typical day at a level of 7 on a 0-10 visual analog scale.  (R. at 104.)

Plaintiff testified that she can walk around the block in her neighborhood, but she must stop on the corners to rest.  (R. at 105.)  She can stand for 10-15 minutes before she must sit down to rest.  (*Id.*)  She does not lift any weight.  (*Id.*)  She can sit for 10-15 minutes before she must get up to move around.  (R. at 106.)  She cannot just transition from sitting to standing for prolonged periods – after a while she must lie down to relieve pain.  (*Id.*)  She lies down between 6 and 7 times a day for an average of 15 minutes per time.  (R. at 107.)

Plaintiff testified that her depression "took over my whole life."  She reported crying all the time, that everything makes her nervous, and that she does not answer her door.  She indicated that she keeps towels over the windows to prevent anyone from seeing in.  She testified that she cannot go out in public because she feels as if people are judging her and talking about her.  She has a hard time concentrating on things.  (R. at 109.)

3

**B.      Vocational Expert Testimony**

Brian Womer testified as the vocational expert ("VE") at the administrative hearing. (R. at 112-53.)  The VE testified that Plaintiff's past relevant work included a grocery store cashier, classified as light, semi-skilled work; and warehouse worker and sandwich maker, both classified as medium, unskilled work.  (R. at 112-13.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's age, education, work experience, and residual functional capacity in which the VE acknowledged that Plaintiff could not perform her past relevant work.  (R. at 113.)

The VE testified that Plaintiff was capable of performing representative occupations such as a polishing machine operator, sorting machine operator or wire insulator, with 2,400 regional jobs and 204,000 jobs in the national economy.  (R. at 115.)

The VE testified that his testimony did not conflict with the Dictionary of Occupational Titles ("DOT"), except that the DOT does not address a sit/stand option.  He indicated, nonetheless, that he based his opinion in that regard on his experience in job placement and vocational rehabilitation.  (R. at 115.)

### III.      MEDICAL RECORDS

**A.      Physical Impairments**

**1.      Grove City Grand Family Practice/Kathy Dodd, M.D.**

Plaintiff has been treating with Grove City Grand Family Practice since at least May 2008.  (R. at 448.)  Plaintiff first saw primary care physician, Kathy Dodd, M.D. in August 2009 for right arm pain when using it at work.  Dr. Dodd diagnosed Plaintiff with lateral epicondylitis in her right arm.  (R. at 476-78.)

4

On January 4, 2011, Dr. Dodd excused Plaintiff from work for two months to attend therapy for her degenerative joint disease of both knees and lateral epicondylitis.  Dr. Dodd noted that nature of Plaintiff's job makes her conditions worse.  She wrote that Plaintiff needed therapy as well as time off to rest and heal her knees and elbow. (R. at 550.)  By February 2, 2011, Dr. Dodd cleared Plaintiff to return to work with no restrictions.  (R. at 553-54.)

On February 10, 2011, Plaintiff complained of depression, reported she was not going out in public, and was going to the store at night.  (R. at 555.)  She was no longer going to counseling because she did not like the counselor.  On examination, Dr. Dodd found morbid obesity, and point tenderness over the lateral epicondyle.  Dr. Dodd indicated that Plaintiff's mental status was anxious and easily tearful, but her judgment and insight were intact.  (R. at 556.)  Dr. Dodd assessed anxiety, left lateral epicondylitis, bilateral degenerative joint disease of the knees, and obstructive sleep apnea.  (R. at 556-67.)  Dr. Dodd "STRONGLY encouraged [Plaintiff] to seek out another counselor ASAP."  (R. at 556.)

In April 2011, Dr. Dodd noted that Plaintiff was diagnosed with hypothyroidism over eleven years prior and had been experiencing a lack of energy, constant weight gain, and heat/cold intolerance.  Dr. Dodd also noted Plaintiff's morbid obesity.  (R. at  558.)  When discussing Plaintiff's depression, Dr. Dodd noted she was doing better on her current medication, but was "not really" following with counseling as Plaintiff says "she just makes me cry." (R. at 559.)

When seen in June 2011, Plaintiff reported that "everything went downhill all of a sudden."  (R. at 569.)  She reported crying all night long, trouble sleeping, worsening anxiety, and daily panic attacks.  (*Id.*)  Plaintiff was no longer seeing her counselor because she felt

worse after treatment.  (*Id.*)  Plaintiff was noted to be tearful, with a depressed mood and flat affect.  (R. at 570.)  Later that month, Plaintiff's daughter called Grove City Grand Family Practice office over concern about her mother, indicating that Plaintiff was crying all the time and would not eat or get out of bed.  (R. at 571.)

In July 2011, Plaintiff complained of knee and elbow pain.  (R. at 574.)  Dr. Dodd found point tenderness over the lateral epicondyle of the left upper extremity, and crepitus and popping with extension and flexion of the bilateral knees.  (R. at 576.)  Dr. Dodd assessed bilateral degenerative joint disease, left lateral epicondylitis, morbid obesity, obstructive sleep apnea, and anxiety.  (R. at 576-77.)  On July 15, 2011, Dr. Dodd wrote a work excuse until September 19, 2011 noting that Plaintiff needed to have physical therapy and to rest her knees and elbow during treatment.  (R. at 579.)

When seen by Dr. Dodd in August 2011, Plaintiff reported feeling depressed, noting she was crying all the time and not getting a lot of sleep, experiencing painful urination, and numbness and tingling down her left arm.  She also reported a 3-day headache.  (R. at 580-81.)  Dr. Dodd noted that Plaintiff was going to physical therapy for her degenerative joint disease in her knees and Plaintiff stated "they're trying to kill me."  Dr. Dodd urged Plaintiff to continued with physical therapy.  Dr. Dodd also increased Plaintiff's Remeron medication for her depression.  (R. at 582.)

In September 2011, Plaintiff reported continuing pain in her knee and experiencing a 45-minute panic attack several days prior.  She was still  crying "all the time."  (R. at 584.)  Dr. Dodd found crepitus and popping with extension and flexion of the knees.  (R. at 585.)  Dr.

Dodd recommended she continue with physical therapy and she increased Plaintiff Remeron. (*Id.*)

By November 2011, Dr. Dodd noted Plaintiff recently completed course of physical therapy, which reduced Plaintiff's pain complaints, but she had very little change in strength, flexion, or standing ability.  (R. at 697.)  Dr. Dodd also noted that Plaintiff's mood continued to be poor.  (*Id.*)  Dr. Dodd assessed left foot pain, bilateral degenerative joint disease of the knees, anxiety, and elevated blood pressure.  (R. at 699.)

In February 2012, Plaintiff reported her depression was worse, and that she didn't want to do anything but lay in bed.  (R. at 688.)  Dr. Dodd recommended that Plaintiff needed counseling inpatient or outpatient intensive therapy, electroconvulsive therapy as a way to manage her depression.  Dr. Dodd indicated that she could do nothing more for Plaintiff with medication.  (R. at 689.)

Plaintiff saw Dr. Dodd on March 2, 2012, for management of her newly diagnosed with type 2 diabetes.  (R. at 789-91.)  When seen on March 16, 2012, Plaintiff complained of back pain, depression, and anxiety and indicated she was considering electroconvulsive therapy at Ohio State University.  (R. at 785-86.)  Plaintiff was seen for a health maintenance appointment in April 2012, in which Dr. Dodd assessed acute renal failure, type 2 diabetes (uncontrolled), hypertension, and anxiety.  (R. at 771-72.)

By June 2012, Plaintiff reported that her mood fluctuates, and she was relying on Klonopin for anxiety and panic attacks.  She reported taking one on a good day and three on a bad day.  Plaintiff was still shopping at night to avoid people, but she was only rarely having panic attacks.  (R. at 765.)  Dr. Dodd assessed type 2 diabetes (uncontrolled), acute renal failure,

low back pain, anxiety, major depression (recurrent), hypertension, and hypothyroidism.  (R. at 767.)

In July 2012,  Plaintiff presented with a leg rash, as well as peripheral edema left greater than right.  Plaintiff reported problems sleeping and nightmares.  (R. at 757.)  Dr. Dodd assessed dermatitis, dysuria, hypertension, and low back pain.  (R. at 758-59.)

Plaintiff reported back pain severity at a level of 9 on a 0-10 visual analog scale, and difficulty sleeping in September 10, 2012.  (R. at 740.)  She indicated she was spending most of her day laying or sitting.  (*Id.*)  Dr. Dodd noted Plaintiff's back pain had not responded to epidural steroid injections, a TENS unit, physical therapy, or medication.  (*Id.*)  On examination, Dr. Dodd found Plaintiff was morbidly obese, tender to palpation of the thoracic and lumbar spine, and decreased knee jerk reflex bilaterally.  (R. at 742.)  Dr. Dodd also found that Plaintiff was alert and cooperative, she had a normal mood and depressed affect with intact judgment and insight. (*Id.*)  Dr. Dodd started Plaintiff on low dose morphine to improve function, noting that it would not eliminate her back pain.  Her psychotropic medication was continued.  (R. at 742-42.)  By September 21, 2012, Plaintiff indicated the morphine helped her to function.  (R. at 733-35.)

In November 2012, Plaintiff reported worsening mood, that she was crying more, and ongoing chronic pain.  Dr. Dodd had Plaintiff sign a pain contract.  Plaintiff noted she was able to do things, such as going to her mother's house or housework, that she would not be able to do without the medication.  (R. at 719.)  On examination, Dr. Dodd noted Plaintiff was morbidly obese and was tender to palpation in the lumbar spine.  (R. at 720.)  Dr. Dodd assessed chronic pain syndrome, major depression (recurrent), type 2 diabetes (uncontrolled), and morbid obesity.

(R. at 721.)  Dr. Dodd indicated, in regards to Plaintiff's depression, that her condition was deteriorating, and that she needed Plaintiff to be more involved in her own care.  (*Id.*)

In January 2013, Plaintiff reported that she was "pretty sore" due to taking down Christmas decorations. (R. at 800.)  Dr. Dodd found Plaintiff was morbidly obese, tender to palpation in the lumbar spine; and on mental status examination, Plaintiff was alert and cooperative, she had a normal mood and depressed affect with intact judgment and insight.  (R. at 801.)  Dr. Dodd continued Plaintiff on her medications.  (R. at 802.)

In February 2013, Dr. Dodd completed a physical capacity evaluation in which she listed Plaintiff's diagnoses as major depression (recurrent, with anxiety), chronic pain syndrome, and morbid obesity.  Dr. Dodd opined that Plaintiff could lift only 1-2 pounds, could walk and stand less than 30 minutes in an 8-hour workday, and could sit less than 2 hours in an 8-hour workday.  Dr. Dodd acknowledged that Plaintiff should have the ability to change positions at will, or approximately once every 15-30 minutes.   Dr. Dodd opined Plaintiff would need the ability to lay down 2-3 times per work day.  (R. at 824.)  Dr. Dodd also opined that Plaintiff could occasionally twist, rarely stoop, bend or climb stairs and never crouch or climb ladders.  Dr. Dodd indicated that the medical findings supporting her conclusions included her "patient report," but also were supported by the medical findings of Plaintifff's oesteoarthritis, chronic pain syndrome and morbid obesity.  Dr. Dodd concluded that, "Patient's main problems are psychiatric – she has recurrent depression, anxiety with panic disorder and some degree of agoraphobia.  Add onto that morbid obesity and chronic pain and she is unable to be a productive worker at pretty much any level."  (R. at 824-25.)

      **2.**      **Capital Sleep Medicine/Timothy Walter, M.D.**

Plaintiff underwent a sleep study in January 2011 due to obstructive sleep apnea.  (R. at 430.)  Plaintiff reported daytime sleepiness in relation to her sleep apnea diagnosis and was prescribed a CPAP machine.  (R. at 435-36.)  When seen for follow up in February 2012, it was noted Plaintiff was compliant with her CPAP machines but she reported ongoing daytime sleepiness.  (R. at 684.)  Dr. Walter recommended weight loss.  (R. at 685.)

### 3.    Madison County Hospital

Plaintiff presented to the emergency room in October 2011, complaining of left foot and ankle pain and swelling.  Plaintiff was found to have moderate swelling of the left foot and ankle, and mild tenderness of the dorsum of the left foot.  Plaintiff was diagnosed with strain of the left foot.  (R. at 610-11.)

Plaintiff returned to the emergency room the following month complaining of low back pain and tingling in the left foot which had been present for 2 months.  On examination, Plaintiff was found to be morbidly obese with increased paraspinal musculature tension with S1 joint tenderness on the left.  (R. at 607-09.)  Plaintiff was diagnosed with lumbosacral pain, strain.  (R. at 608.)

Plaintiff attended seven physical therapy sessions between December 23, 2011 and February 16, 2012, under the diagnosis of left S1 radiculopathy.  (R. at 617.)  Plaintiff's initial problems were noted as decreased trunk range of motion with pain, tenderness at L4-L5, mild weakness of the lower extremities, positive straight leg raising on the left, and positive slump test.  Plaintiff was discharged due to non attendance.  (R. at 614-17.)

### 4.    Robert Mueller, M.D.

In November 2011, Plaintiff consulted with orthopaedic specialist, Dr. Mueller, for her left leg pain, numbness, and tingling.  On examination,  Dr. Mueller found left ankle swelling, and diminished sensation of the left foot.  Dr. Mueller suspected Plaintiff may have shingles and he ordered an EMG to look for evidence of neuropathy.  (R. at 626.)

Plaintiff returned on December 5, 2011, stating "that things are bothering her still," and she also has back pain.  Dr. Mueller noted the EMG was positive for left S1 radiculopathy.  Dr. Mueller indicated Plaintiff is off work for 4 weeks.  He recommended physical therapy.  (R. at 605.)

An x-ray of the lumbar spine that same day showed bilateral pars defect at L5 with grade 1 spondylolisthesis at L5-S1.  (R. at 606.)

In January 2012, Plaintiff reported that her back pain was "getting a little bit better."  Dr. Mueller found some tenderness in the lumbar paraspinal region on examination.  He ordered an MRI.  (R. at 624.)

An MRI of the lumbar spine taken on February 14, 2012, revealed L5-S1 grade 1 anterolisthesis of L5 relative to S1, pseudo disc listhesis, chronic bilateral spondylosis, and moderate biforaminal stenosis.  At L4-L5 there was a tiny central herniated nucleus pulposus that was neurocompressive.  At L3-L4 there was a protruding disc causing mild left foraminal stenosis, mild narrowing of the central canal, and ligamentum flavum hypertrophy.  (R. at 628-29.)

In February 2012, Dr. Mueller indicated, "the patient has sciatica or radiculopathy on the left, but it continues to be an issue for her."  (*Id.*)  Dr. Mueller indicated, "the next step would be

11

referral to spine surgery if we cannot get things to be better for her in some other way." (R. at 622.) Dr. Mueller referred Plaintiff to Dr. Sardo. (R. at 623.)

In March 2012, Dr. Mueller completed a questionnaire in which he opined that Plaintiff should not lift more than 10 pounds, should perform no squatting, should not climb ladders, should not bend at the waist, and should not walk greater than 1 hour in a work day. (R. at 619-21.)

### 5. James Sardo, M.D.

Plaintiff initially saw pain management specialist, Dr. Sardo on March 6, 2012. (R. at 797-98.) Plaintiff reported chronic back pain that was constant and worse with standing and walking. She got some relief from laying down. (R. at 797.) Dr. Sardo found Plaintiff's gait was slow but steady, sensation was decreased to pinprick in the left foot, reflexes were absent at both lower limbs, there was tenderness over the left lumbosacral region, and seated straight leg raising was positive on the left side. (*Id.*) Dr. Sardo assessed left L3/L4 disc protrusion, L5/S1 spondylolisthesis and spondylolysis, left lumbosacral radiculopathy and morbid obesity. (R. at 798.)

 Plaintiff received two left L4-L5 epidural steroid injections in April and May 2012. (R. at 663, 796.) On May 9, 2012, Plaintiff reported some improvement in burning/tingling in her feet with epidural steroid injections. (*Id.*) Dr. Sardo found Plaintiff was mildly tender in the lumbar region and noted a steady gait and full 5/5 muscle strength. Dr. Sardo strongly recommended weight loss and he prescribed a TENS unit. (R. at 717.) Plaintiff was fitted for a TENS unit on May 18, 2012. (R. at 793.)

### 6. State Agency Evaluation

On December 5, 2011, state agency physician, Leon Hughes, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 155-58, 161-63.)  Dr. Hughes opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at 161-62.)  Plaintiff is also limited to frequently stoop; occasionally climb ramps/stairs, kneel, crawl and crouch; and never climb ladders/ropes/scaffolds.  (R. at 162.) According to Dr. Hughes, Plaintiff's postural limitations are based on her degenerative joint disease of her bilateral knees and morbid obesity with a BMI over 50.  (*Id.*)  Dr. Hughes also found that Plaintiff must avoid concentrated exposure to hazards, *i.e.* machinery and heights.  (R. at 163.)  Gerald Klyop, M.D.  reviewed Plaintiff's records upon reconsideration on May 2, 2012, and essentially affirmed Dr. Hughes's assessment.  (R. at 192-94.)

## B.     Mental Impairments

### 1.     Mental Health Services for Clark County, Inc.

Plaintiff sought mental health treatment from Mental Health Services for Clark County, Inc. in December 2010.  (R. at 413.)  Initially, Plaintiff reported that she was suffering from depression, panic attacks, and behavioral physical functioning.  (*Id.*)  Plaintiff reported that she had been isolating herself over the preceding year, felt uncomfortable around people, and experienced a lot of anxiety and panic attacks.  (*Id.*)  She reported feeling hopeless about her future.  (*Id.*)  She was irritable.  (*Id.*)  In the past year Plaintiff reported gaining weight from 280 to 358 pounds.  (*Id.*)  She reported a "terrible" short term memory.  (R. at 414.)  The intake social worker, Janice Bersoff, ACSW, LISW, found Plaintiff's mood was definitely anxious and depressed.  Plaintiff's insight seemed to be adequate but her judgment is "very poor."  (R. at

13

417.)  Ms. Bersoff found Plaintiff cooperative and polite and her memory was intact.  Ms.

Bersoff diagnosed major depressive disorder (recurrent, moderate), anxiety disorder, and panic

disorder.  (R. at 418.)  Ms. Bersoff also considered a diagnosis of dependent personality disorder.

(*Id.*)  She assigned Plaintiff a GAF score of 55.  (*Id.*)  Plaintiff had attended one additional

appointment at Mental Health Services for Clark County, Inc., but was discharged from care on

March 18, 2011 due to an inability to connect for services.  (R. at 411.)

### 2.  Barbara J. McDermott, Ed.D.

Plaintiff was evaluated for disability purposes by Barbara J. McDermott, Ed.D. on

November 4, 2011.  (R. at 592-98.)  Plaintiff stated she was filing for disability due to "My life

is awful."  She reported that her dad died when she was 9; her husband left her; her house was

foreclosed; and her husband did not like her to work when they were married which made it hard

for her to get a job because of an inconsistent work history.  (R. at 592.)  At the time of this

evaluation, Plaintiff was prescribed Prozac, Klonopin, Abilify, and Remeron.  She reported that

she stopped counseling because "I felt worse when I left."  (R. at 593.)  Dr. McDermott noted

Plaintiff approached tasks with valid effort.  (R. at 594.)  Plaintiff's affect was broad and reactive

and appropriate to topic of conversation.  Dr. McDermott noted a depressed and anxious mood,

and mildly elevated psychomotor activity.  (R. at 595.)  Plaintiff reported a pattern of "starving

herself all day and then bingeing at night" with weight gain of 88 pounds over the past three

years.  (*Id.*)  Plaintiff also reported crying spells approximately twice a week with increased

emotionality during the holiday season and increased social withdrawal.  When tested

cognitively, Plaintiff made four errors with serial sevens, and could remember five digits

forward, and three digits backward.  She spelled "world" backwards correctly and gave correct

responses to the meaning of proverbs.   Plaintiff remembered three out of three objects after five

minutes and showed good practical reasoning.  (R. at 596.)  Plaintiff was diagnosed with major

depressive disorder (recurrent, moderate), and panic disorder with agoraphobia.  (R. at 597.)  Dr.

McDermott opined that Plaintiff had adequate comprehension and average intelligence and could

be expected to have some difficulty managing workplace pressure.  (R. at 598.)

### 3.    Douglas Pawlarczyk, Ph.D.

On January 18, 2013, Plaintiff was psychologically evaluated by Douglas Pawlarczyk,

Ph.D., on behalf of the Madison County Department of Job and Family Services.  (R. at 826-31.)

Dr. Pawlarczyk found Plaintiff's mood was significant for depression and anxiety.  Her affective

expressions were somewhat labile in that towards the conclusion of her evaluation she cried

profusely.  Interpersonally, Dr. Pawlarczyk found Plaintiff "was struggling with some severe

emotional problems.  Perhaps foremost, she seemed quite anxious."  Throughout the evaluation,

Dr. Pawlarczyk noted Plaintiff "would breathe rather heavily and seemed notably tense."  (R. at

827.)  Dr. Pawlarczyk diagnosed major depression (recurrent, severe without psychotic features),

and panic disorder with agoraphobia.  (R. at 830.)  He assigned Plaintiff a GAF score of 50.  (*Id.*)

Dr. Pawlarczyk indicated Plaintiff had significant problems sustaining her focus and

concentration due to underlying emotional difficulties.  (R. at 830.)  Dr. Pawlarczyk opined that

Plaintiff's ability to cope with the stress that would typically be encountered as a part of

competitive employment would seem to be poor.  (R. at 830-31.)  He noted that "[s]he seemed to

have difficulty coping with even the minimal stress of the evaluation process itself."  (R. at 831.)

He concluded, "she would not appear to be capable of engaging in any remunerative

employment at this time."  (*Id.*)  Dr. Pawlarczyk opined that Plaintiff's mental health

impairments would meet the Listings for affective disorder (12.04) and anxiety disorder (12.06.). (*Id.*)

### 3.     State Agency Evaluation

On December 5, 2011, after review of Plaintiff's medical record, Tonnie Hoyle, Psy.D., a state agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration. (R. at 160.) She further determined that the evidence did not establish the presence of the "C" criteria. (*Id.*) Dr. Hoyle found Plaintiff's allegations were partially credible, noting that Plaintiff's statements are not entirely consistent within themselves, her performance and presentation at the consultative evaluation, and the entirely of evidence. (R. at 161.) Dr. Hoyle gave great weight to Dr. McDermott's opinion. (*Id.*)

In completing the MRFC,[1] Dr. Hoyle opined that Plaintiff was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Hoyle noted that Plaintiff's workplace should remain relatively static and require no fast pace and no strict production quotas due to Plaintiff having anxiety symptoms when under stress. (R. at 164.) Plaintiff was also found to be moderately limited in her abilities to interact

---

[1]"MRFC" is an residual functional capacity which limits its consideration to mental capabilities.

appropriately with the general public; and to respond appropriately to changes in the work setting.  (R. at 164-65.)

On May 1, 2012, state agency psychologist, Leslie Rudy, Ph.D. reviewed the file on reconsideration and essentially affirmed Dr. Hoyle's assessment.  (R. at 194-96.)

### IV.  ADMINISTRATIVE DECISION

On March 25, 2013, the ALJ issued her decision.  (R. at 131–47.)  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016.  (R. at 136.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of July 6, 2011. (*Id.*)  The ALJ found that Plaintiff had the severe impairments of degenerative disc disease, diabetes, sleep apnea, knee arthritis, obesity, depression, and anxiety.  (*Id.*)  The ALJ found Plaintiff had the non-severe impairments of elbow arthralgia and non-severe gout.  (R. at 137.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

She further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> [Plaintiff] has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except [Plaintiff] must alternate between sitting and standing at will provided that she is not off task more than 5% of the work period. [Plaintiff] can never climb ladders, ropes, or scaffolds and must avoid all exposure to unprotected heights. [Plaintiff] can only occasionally climb ramps or stairs, stoop, crouch, kneel, and crawl. [Plaintiff]'s work is limited to one or two step tasks in an environment free of fast paced production requirements. [Plaintiff] must be employed in a low stress job with only occasional decision making required and only occasional changes in the work setting. [Plaintiff] can only occasionally interact with the public and co-workers.

(R. at 140.) The ALJ found Plaintiff's statements regarding the disabling nature of her impairments are not apparent in the evidence. (R. at 143.) The ALJ gave Dr. Dodd's opinion "little to no weight," finding that the opinion was inconsistent with Dr. Dodd's treatment notes; she is a general practitioner, not a specialist; and Dr. Dodd attributed Plaintiff's limitations to psychiatric conditions, but is not a psychologist or psychiatrist. (R. at 144.) The ALJ assigned "significant weight" to the state agency reviewing physicians opinions noting their findings are consistent with objective examination and consistent with Plaintiff's conservative treatment. (*Id.*) The ALJ determined, however, that these physicians likely overestimated Plaintiff's abilities because she is morbidly obese and has uncontrolled diabetes, which would limit her to sedentary work. (*Id.*) The ALJ assigned "little to no weight" to Dr. Pawlarczyk's evaluation because it was completed at the request of Plaintiff's counsel,[3] the limitations are inconsistent

---

[3]As discussed more fully below, the ALJ failed to properly analyze the opinions of Plaintiff's treating physician, Dr. Dodd. While the Undersigned does not discuss Plaintiff's

with the conservative nature of treatment Plaintiff was receiving, the opined limitations are also inconsistent with Plaintiff's reported activities of daily living, and the limitations contradict Dr. Pawlarczyk's own intelligence testing. (R. at 144-45.)  The ALJ granted "great weight" to the state agency psychologists noting their findings are consistent with Plaintiff's performance in cognitive testing where she showed adequate comprehension, good memory, and average intelligence and consistent with Plaintiff's conservative treatment for her mental impairments. (R. at 144.)  Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy.  (R. at 146.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 147.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

---

additional statement of error regarding the weight the ALJ assigned to the opinion of Dr. Pawlarcyzk, it should be noted that this first rationale for granting little weight to his report because it was performed at the request of Plaintiff's counsel is incorrect. Dr. Pawlarcyzk's report reveals the referral source was "Madison County Department of Jobs and Family Services." (R. at 826.)

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ erred in her analysis of medical source opinions. In particular, Plaintiff contends that the ALJ erred in her analysis of Plaintiff's treating source opinion of Dr. Dodd. The Undersigned agrees and therefore recommends that the Court remand the case for reconsideration of the issue.[4]

## A.   Treating Physician Rule

---

[4]Plaintiff also contends that the ALJ erred in her evaluation of the opinions of Dr. Pawlarcyzk and Dr. Meuller, and failed to consider the effect of Plaintiff's chronic pain syndrome. Because the Undersigned finds that the ALJ failed to properly analyze the opinions of Plaintiff's treating physician, the Court does not address these additional contentions of error. The Commissioner, however, may wish to address these matters if the case is ultimately remanded.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique prospective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. §

416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.  *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(e).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

**B.**     **ALJ's Discussion of Dr. Dodd's Opinions**

The ALJ rejected the opinion of Dr. Dodd because "a lot of her opinion is based on the claimant's reports," "during objective examinations, the claimant consistently had full muscle strength, a normal gait, and intact senses," and because Dr. Dodd is only "a general practitioner, not a specialist." (R. 144).  Specifically, the ALJ had only this to say regarding Dr. Dodd:

> The [Plaintiff's] treating physician, Dr. Kathy Dodd M.D. opined that the [Plaintiff] cannot perform even sedentary work and cannot lift more than two pounds, sit more than two hours, and stand or walk more than twenty minutes. While Dr. Dodd is an acceptable treating source, her opinion is not persuasive for a number of reasons. First, Dr. Dodd acknowledges that a lot of her opinion is based on [Plaintiff's] reports. This is clear because during objective examinations, [Plaintiff] consistently had full muscle strength, a normal gait and intact senses.  [Plaintiff's] description of her impairments is vastly more limiting than the objective evidence in the record revealed it to be.  Also, [w]hile Dr. Dodd treated [Plaintiff] for six years, she is a general practitioner, not a specialist.  Also, Dr. Dodd attributes [Plaintiff's] main problems are psychiatric, when she is not an acceptable psychological medical source.  For those reasons, I grant her opinion little to no weight.

(R. at 144, citations to record omitted.)

The ALJ failed even to mention the treating physician rule or any of the factors that should be considered under the regulations.  Her analysis of Dr. Dodd's opinion fell well short of what is required under the law.[5]  For this reason alone, the ALJ's decision should be reversed and this case remanded for further proceedings.

---

[5]The Commissioner posits that the ALJ's reference to Dr. Dodd's citation to Plaintiff's subjective complaints implies that the ALJ was really saying that Dr. Dodd's opinion is not based on "clinical and laboratory diagnostic techniques." The Commission suggests that reference should suffice as the ALJ's rationale for not giving controlling weight to Dr. Dodd's opinion.  Def's Mem. in Opp., at 7 n.2.  It may very well be that the ALJ harbored this notion. The point is, however, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend,* 2010 WL 1725066, at *7.  Here, if the ALJ believed Dr. Dodd did not base her opinion on clinical and laboratory diagnostic techniques, she did not make that rationale sufficiently clear.

In any event, the Undersigned concludes, however, that substantial evidence does not support the ALJ's stated reasons for assigning "little to no weight" to Dr. Dodd's opinion.  With respect to Plaintiff's physical impairments, Dr. Dodd's opinion was based only in part on Plaintiff's reports and is well supported by medically acceptable data.  Along with her physical capacity evaluation, Dr. Dodd submitted several years of office notes.  (R.  at 442-591, 635-650, 687-700, 718-791, 799-822). Within those records Dr. Dodd noted, on numerous occasions, tenderness in the lumbar spine.  (R. at 742, 760).  She also noted a decreased knee jerk reflex bilaterally.  (R.  742).  Further, Dr. Dodd noted Plaintiff's frequent complaints of chronic pain. (R. at 442-591, 635-650, 687-700, 718-791, 799-822).  Dr. Dodd also reviewed x-rays and an MRI of Plaintiff's lumbar spine which supported her opinion of Plaintiff's restrictions.

Moreover, Dr. Dodd's report is also not inconsistent with other substantial evidence of record.  Substantial evidence supports Dr. Dodd's opinion including an EMG that was positive for a left S1 radiculopathy (R. at 605); an intake examination in which her physical therapists noted decreased trunk range of motion with pain, tenderness at L4-L5, mild weakness of the lower extremities, positive straight leg raising on the left, and positive slump test (R. at 617); a x-ray of the lumbar spine that indicated a bilateral pars defect at L5 with grade 1 spondylolisthesis at L5-S1 (R. at 606); an MRI of the lumbar spine indicated L5-S1 grade 1 anteriolisthesis of L5 relative to S1, pseudo disc listhesis, chronic bilateral spondylosis, moderate biforaminal stenosis, a tiny L4-L5 herniated nucleus pulposis, L3-L4 protruding disc with mild left foraminal stenosis, mild central canal narrowing, and ligamentum flavum hypertrophy (R. at 628-29); Dr. Mueller indication that the "next step" in treating Plaintiff's back pain was spinal surgery (R. at 622); Dr. Mueller notation of a slow gait, decreased sensation to pin prick in the

left foot, absent reflexes in both lower limbs, lumbosacral tenderness, and positive straight leg raising on the left (R. at 797-98); and Dr. Sardo's notation that physical therapy had not improved Plaintiff's symptoms, and that other treatment, including steroid injections and a TENS unit, had not been successful. (R. at 717). This evidence far outweighs the meager evidence cited by the ALJ in support of her rationale to afford little to no weight to Dr. Dodd's opinion.

To the extent the ALJ rejected Dr. Dodd's opinion regarding Plaintiff's psychological impairments because she is not a psychologist or psychiatrist, the Undersigned notes that the record is replete with evidence that Plaintiff suffers from major depression and anxiety. While specialization is a relevant consideration in determining the weight to assess to a treating source's opinion, "[a] treating physician's opinion on the mental state of his patient constitutes competent medical evidence even though the physician is not a certified psychiatrist." *Bushor v. Comm'r of Soc. Sec.*, No. 1:09-cv-320, 2010 WL 2262337, at *10, n.4 (S.D. Ohio Apr. 15, 2010). Specialization is only one of the relevant factors to consider in weighing medical evidence. Other factors include the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship. *See Wilson* , 378 F.3d at 544.

It is undisputed that Plaintiff sought treatment from Dr. Dodd for her depression and anxiety and that Dr. Dodd prescribed and adjusted her prescription medications to manage these mental impairments. Dr. Dodd's opinions that Plaintiff's main problems are recurrent depression, anxiety with panic disorder and some degree of agoraphobia are wholly supported by her own treatment notes as well as other substantial evidence in the record. In this case, because

of the length and extent of her treatment of Plaintiff, Dr. Dodd was in a unique position to provide an opinion as to the combined impact of Plaintiff's physical and mental limitations. The ALJ failed to even consider Dr. Dodd's opinion at all with respect to Plaintiff's psychological condition.[6]

Under these circumstances, substantial evidence does not support the ALJ's stated reasons for providing "little to no weight" to Dr. Dodd's opinion. On remand, a proper analysis of the record might not support giving controlling weight to the opinions of Dr. Dodd. Even if Dr. Dodd's opinions are not entitled to controlling weight, they must still be weighed in accordance with the prescribed regulations.

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence does not support the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

---

[6]It is not unusual for individuals to seek treatment for depression from their primary care physicians. See, e.g., *Short v. Barnhart*, No. 03-46-B-W, 2004 WL 202858 (D. Me. Jan. 30, 2004), report and recommendation adopted, 2004 WL 345456 (D. Me. 2004) (remanding claim where claimant's primary care physician explained that in his rural area, diagnosis and treatment of depression had become the responsibility of primary care providers).

question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed,

appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d

981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation

omitted)).

Date:    August 3, 2015                          __/s/ *Elizabeth A. Preston Deavers*___
                                                 Elizabeth A. Preston Deavers
                                                 United States Magistrate Judge